See also D.C., 412 F.Supp. 488.

Karen BRESCIA

v.

IRELAND COFFEE–TEA, INC.

and

West Bend Company, Defendants,

and

Casa Milano, Third-Party Defendants.

Civ. No. 75–1771.

United States District Court,
E. D. Pennsylvania.

Feb. 25, 1977.

Arthur G. Raynes, Philadelphia, Pa., for plaintiff.

James D. Wilder, Esquire, Philadelphia, Pa., for West Bend.

Earl H. Parsons, Philadelphia, Pa., for Ireland.

Michael A. Valenza, Philadelphia, Pa., for Casa Milano.

## OPINION

DITTER, District Judge.

In this products liability case, plaintiff seeks a new trial on the grounds that portions of defendant's summation and the court's charge were unsupported by the evidence. Despite the serious nature of her injuries, plaintiff's motion must be refused.

Karen Brescia[1] was badly hurt on October 10, 1974, while working as a waitress at Casa Milano, Inc., a center-city Philadelphia restaurant, when a 55-cup coffee urn manufactured by defendant, West Bend Company,[2] fell on her. The urn rested without any guard or restraining device on a small, three-foot high refrigerator which was used to store desserts in a convenient pantry area. Whenever a waitress wanted anything from the refrigerator, she had to kneel or stoop to reach into it, thus placing her body beneath the level of the coffee urn. On the day in question, Brescia had gone to the refrigerator to get a piece of cheesecake for a customer. As she was delivering it, another patron saw the cheesecake and asked for a similar serving. Brescia immediately returned to the refrigerator, stooping below the coffee urn just before reaching to open the door. The next thing she remembered was being struck on the shoulders and back by the hot coffee which scalded her severely. The refrigerator had a smooth enamel top and its design was such that the top of the front-mounted door was level with the top of the body of the unit and, when the door was closed, separated from the top of the body only by a thin rubber gasket. It was apparent that in order for the urn to fall as it did, one of the three neoprene pads (or feet) on which it stood had to be resting on top of the refrigerator door. When the door was opened the support for this pad moved away, causing the urn to topple forward. The parties did not dispute that the accident happened because the urn was resting partly on the refrigerator door; rather the case centered on how the urn got to that position.

Plaintiff's theory, which was supported by her expert, was that the urn was defectively designed because the type and total area of anti-skid material in the three pads on which the urn rested was insufficient— and thus vibrations would cause it to "creep" on a smooth surface of the type often found in kitchens where such urns are used. In the alternative, plaintiff argued that the urn was defectively manufactured because the anti-skid material was improp-

---

1. Approximately one month after the trial in this case Miss Brescia died of injuries unrelated to the accident in question.

2. At the close of plaintiff's case and with her consent, I granted a directed verdict against her in favor of Ireland Coffee-Tea, Inc., which had sold the urn to Casa Milano.

erly secured, since by the time the urn was inspected this material had disappeared from two of these three pads.[3] Plaintiff contended that the urn had been properly placed atop the body of the refrigerator and that the vibration which resulted from opening and closing the refrigerator door, the operation of the refrigerator motor, people walking back and forth in the heavily-traveled pantry area, etc., had caused the urn gradually to move forward until one of its feet was resting on the refrigerator door. It was this claimed propensity of the urn to "creep" on a smooth surface during normal use that formed the heart of plaintiff's claims of defective design and manufacture.

West Bend offered a completely different explanation for the cause of the accident. Its theory was that the coffee urn had been deliberately placed in a position where part of its base was resting on the refrigerator door and inadvertently not pushed back to where it would have been safe.

In order to prove this theory, West Bend called upon two expert witnesses. Dr. Steven Batterman, an engineer who examined the urn in question and made certain measurements, testified that normal opening and closing of the refrigerator door would not cause the urn to move at all, but that if it did move slightly, the movement would be toward the rear of the refrigerator, that is away from the door.[4] It was Dr. Batterman's opinion that the urn was not defectively designed and that the design of the urn had nothing to do with the cause of the accident.

■ Defendant's second expert witness, Donald Luetschwager, an engineer employed by West Bend, testified that a test[5] he conducted using a similar urn and refrigerator showed that when the urn was placed upon the body of the refrigerator and the door opened and slammed closed ten times, the urn always moved backward and slightly to the left.[6] The direction of

3. There was no direct evidence that two of the three neoprene pads were missing from the base at the time of the accident, since no examination of the urn was made immediately thereafter. The only direct evidence was that the urn had two pads missing when Dr. Batterman examined it some seventeen months later, on March 23, 1976. By the time of trial in May, 1976, the third pad had disappeared. Plaintiff thus had to rely on whatever inference could be drawn as to the urn's condition at the time of the accident. See note 4 infra.

4. At the time Dr. Batterman examined the refrigerator, on March 23, 1976, only one of the neoprene non-skid pads, the one at the rear of the urn, was in place. Dr. Batterman stated that the presence or absence of these pads would not have changed his opinion about the tendency of the urn to slide on the refrigerator top. He also stated that his opinion would be the same even if the refrigerator had been tilted slightly forward.

5. Mr. Luetschwager's tests were conducted *ex parte* at defendant's plant in Wisconsin, videotaped, and shown to the jury at trial.

6. Plaintiff contends that Mr. Luetschwager's tests showing that the urn moved backward and to the left contradicted the testimony of defendant's other expert, Dr. Batterman, that the urn would not move at all. This is simply not so. Dr. Batterman testified that his opinion

was based upon normal opening and closing of the door (N.T. 38), that he did not take into account the added force that would be involved in slamming the door (N.T. 46), and that slamming the door could well cause the urn to move backward (N.T. 69). Mr. Luetschwager's tests, of course, did consist of opening and *slamming* the door closed. In fact, Mr. Luetschwager specifically stated that he had to use exaggerated force because when he opened and closed the door normally ten times the urn did not move at all (N.T. 181).

Plaintiff also makes much of a supposed "dramatic admission" in which Mr. Luetschwager stated on cross examination that it might be possible for the urn to move forward. See N.T. 190. This statement, made in the context of a confusing line of questioning and a grossly exaggerated courtroom demonstration of the ability of the urn to move when sitting atop a lectern, can hardly be regarded as a clear admission that the accident could have happened as plaintiff theorized. Moreover, even if this statement did offer some support to plaintiff's theory of the case, what weight, if any, it was to be given was clearly within the province of the jury.

Finally, plaintiff argues that defense counsel's failure specifically to ask Mr. Luetschwager for his opinion as to the cause of the accident and whether the urn was defective amounted to "a glaring failure of proof fatal to defendant's case." In view of the fact that

movement remained the same whether the urn had all three anti-skid pads in place or only one and regardless of the amount of liquid in the urn, although these variables did affect the degree of movement. Mr. Luetschwager conducted a second test which showed that if, with the refrigerator door open, the urn was placed so that approximately one-third of its base overhung the body of the refrigerator and the door then closed, the urn would be pushed backward.[7] In a third test, Mr. Luetschwager placed the urn so that part of its base was resting on the refrigerator door. With the urn in this position, if the door was opened rapidly the urn would remain in place; however, if the door was opened slowly the urn would fall.

In addition to demonstrating through the testimony of its experts that the urn would not creep forward, defendant relied on the testimony of plaintiff and her expert to establish a viable explanation for the urn's being placed so that it rested partially on the refrigerator door. During her testimony Miss Brescia stated that the coffee urn was not used to obtain individual servings of coffee. Rather the urn was used to fill glass coffee pots which were kept on a hot plate in another area of the dining room. Individual cups of coffee were served from these glass pots. Brescia testified that in order to get the coffee pots under the urn's spigot it was necessary to tilt the pots slightly (N.T. 79–80) and that to make it easier to fill the pots the urn at times was situated so that the spigot was out over the edge of the refrigerator but that she could not recall if the urn was so situated on the night of the accident (N.T. 93).[8] Plaintiff's expert, Mr. Lerner, acknowledged that situating the urn so that its spigot was out over the edge of the refrigerator was the most practical way to fill the coffee pots (N.T. 143). He testified that the nozzle of the urn did not protrude very far in front of its body which meant that the urn had to be kept close to the edge of whatever surface it rested upon (N.T. 129).[9]

At the conclusion of the evidence, defense counsel argued that the cause of

---

plaintiff had the burden of proof, this argument amounts to a claim that in the absence of Mr. Luetschwager's opinions on these matters the evidence supporting plaintiff's theory was such that the jury was required to find in her favor. Needless to say, the evidence was hardly so compelling. Moreover, if as plaintiff argues, Mr. Luetschwager's response to the questions she contends defense counsel should have asked him would have been favorable to plaintiff, it is difficult to understand why plaintiff's counsel never asked Mr. Luetschwager these questions on cross examination.

7. The purpose of this test was to show that even if the urn had gradually crept forward (but not enough to fall) it would have been pushed backward when Brescia closed the door after getting the first piece of cheesecake and would have had insufficient time to creep back onto the door again before Brescia opened the door the second time.

Plaintiff contends that this second test was not conducted under the same conditions that existed at the time of the accident. As noted earlier (see note 4 supra), when Dr. Batterman examined the urn in question some seventeen months after the accident the only nonskid pad in place was the one at the rear of the urn. Yet in Mr. Luetschwager's test on an urn with two pads missing the pad that was in place was the right front one. Since the pads protruded slightly from the bottom of the urn plaintiff contends that the reason the urn moved backwards in this second test was not because of vibration, but because of physical contact between the closing door and this front pad, which caused the urn to be pushed backward. Although it is not entirely clear, if plaintiff's reason for raising this point is to suggest that a new trial is warranted on this basis, the answer is that she made no objection to the introduction of the second test and cannot raise such objection for the first time now. See *Connor v. Crescent Lighting Corp.*, 61 F.R.D. 62, 64 (E.D. Pa.1973). Neither may plaintiff claim that she did not appreciate until after trial what had really happened in the second test because her counsel specifically argued this point to the jury in his closing remarks. See N.T. 245–46.

8. Brescia also stated that she was always wiping coffee stains from the front of the refrigerator. This could lead one to infer either that the spigot often was situated very close to or overhanging the front of the refrigerator or that the refrigerator was tilted forward. Which inference to be drawn was, again, a matter for the jury.

9. Lerner also stated that the closeness of the spigot to the body of the urn was itself a design defect (N.T. 129). However, plaintiff did not pursue this theory as a basis for recovery.

the accident was that between the time Brescia obtained the first piece of cheesecake and the time she came back for the second, some unknown employee of Casa Milano went to the urn to fill a coffee pot and in order to facilitate that operation pulled the urn forward onto the refrigerator door. See N.T. 230–32. In my charge, I told the jurors they would have to decide if this was what had happened, reminding them that there was no direct evidence that the urn had been deliberately moved during Brescia's absence. See N.T. 279–80. Plaintiff contends that this argument and charge were unsupported by the evidence. I disagree. It is, of course, axiomatic that in closing argument counsel may not argue inferences not supported by the record evidence and that it is improper for a court to submit to the jury for its determination a point which the evidence does not warrant. See, e. g. *Millen v. Miller,* 224 Pa.Super. 569, 308 A.2d 115, 117, 119 (1973). However, no such error occurred in this case.

Although there was no direct testimony that anyone had pulled the urn onto the door during the hiatus between Brescia's trips to the refrigerator, the evidence certainly was sufficient for the jury to infer that this was what happened. If the jury believed the testimony of defendant's experts that the urn either would not move forward at all or (based on the second test, see note 7 supra) would not move onto the refrigerator door in the interval between Brescia's trips to the refrigerator, then obviously someone had to place the urn on the door. The fact that moving the urn to the edge of the object it rested upon would facilitate filling the coffee pots clearly gave added weight to the inference that someone deliberately had placed part of the urn on the door. Since the conclusion defense counsel wished the jury to draw had support in the evidence, his argument and the court's charge in this regard were perfectly proper. See *Contractors Lumber and Supply Co. v. Quinette,* 386 Pa. 517, 522, 126 A.2d 442 (1956); *Easter v. Hancock,* 237 Pa.Super. 31, 346 A.2d 323, 326 (1975); cf. *Lustine-Nicholson Motor Co. v. Petzal,* 106 U.S.App.D.C. 18, 268 F.2d 893 (1959).

■ Plaintiff's remaining assignment of error is also based on West Bend's counsel's closing remarks to the jury. Since plaintiff had been injured during the course of her employment she was precluded by the Workmen's Compensation Act from suing her employer. However, West Bend did join Casa Milano in a third party action seeking contribution or indemnity. During his closing argument counsel for West Bend stated:

Miss Brescia happened to be an employee of Casa Milano. *An employer has a certain duty to an employee and the duty may have many ramifications, but it boils down to the duty to provide the employee with a safe place to work, provide equipment which is safe and proper and if the employer fails in that duty then the employer is liable to the employee.* (N.T. 233—emphasis added).

Plaintiff contends that this argument left the jury with the erroneous impression that plaintiff could have sued her employer but chose not to do so and brought her action against West Bend instead. She argues that in response to defense counsel's remarks I should have allowed her counsel to tell the jury on rebuttal that Brescia did recover Workmen's Compensation payments but that she would have to make reimbursement for such payments in the event she recovered against West Bend.

■ The simple answer to plaintiff's contention is that she reads too much into defense counsel's remarks. This is not a case where the jury was informed that plaintiff had recovered collateral source benefits, so that its verdict might have been motivated by a desire not to award "double recovery." See *Boudwin v. Yellow Cab Co.,* 410 Pa. 31, 188 A.2d 259 (1963); *Lobalzo v. Varoli,* 409 Pa. 15, 185 A.2d 557 (1962). In the context of defense counsel's total remarks, the statement that an employer has certain duties to its employees for the breach of which he is "liable" did not amount to telling the jury that plaintiff had a *right to sue* Casa Milano, but only that *the accident was Casa Milano's fault.* In-

deed, immediately before making the challenged remarks defense counsel stated:

> In this lawsuit the plaintiff has sued West Bend Company, claiming West Bend produced a defectively designed coffee pot, unreasonably dangerous, that that defect was the cause of Miss Brescia's accident, her injuries. West Bend has turned around and said to Casa Milano, *it's not our fault.* There is nothing wrong with our coffee urn. *It's your fault for the manner in which you took care of it or used it.* (N.T. 232—emphasis added).

If supported by the evidence,[10] it is certainly not error for a defendant to argue, in support either of its own freedom from liability or its attempt to pass on or spread its liability, that a third party's actions were wholly or partially responsible for a plaintiff's injuries, even if that third party may be immune from suit by the plaintiff. There was no other reference during the trial about plaintiff's rights as against Casa Milano. In these circumstances the possibility that the jury interpreted the challenged remarks as suggested by the plaintiff is simply unrealistic. I conclude that these remarks in no way tainted or influenced the jury's verdict. See *Peterson v. Calmar Steamship Corp.,* 296 F.Supp. 8, 12–13 (E.D.Pa.1969); *Gladden v. P. Henderson & Co.,* 39 F.R.D. 303, 304 (E.D.Pa.1966), affd., 385 F.2d 480 (3d Cir. 1967), cert. denied, 390 U.S. 1013, 88 S.Ct. 1262, 20 L.Ed.2d 162 (1968); *Richardson v. Wilkes-Barre Transit Co.,* 172 Pa.Super. 636, 640, 95 A.2d 365 (1953).

For the reasons stated above plaintiff's motion for a new trial is denied.

---

10. Plaintiff does not claim that there was insufficient evidence to support the argument that Casa Milano was at fault.